**FILED**

**Lucinda B. Rauback, Clerk**
**United States Bankruptcy Court**
**Augusta, Georgia**
*By jpayton at 12:54 pm, Mar 21, 2017*

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE

SOUTHERN DISTRICT OF GEORGIA
Savannah Division

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 Case |
| | ) | Number <u>17-40113</u> |
| J. Timothy Shelnut, | ) | |
| | ) | |
| Debtor | ) | |
| | ) | |

## OPINION AND ORDER

This order addresses Virginia "Sam" Pannill, f/k/a Virginia P. Shelnut's ("Ms. Pannill") Emergency Motion to Abstain, or in the Alternative, for Modification of the Automatic Stay, or a Determination that the Automatic Stay is Not Applicable Under 11 U.S.C. §362(b)(1) and (2). This is a core proceeding under 28 U.S.C. §157(b)(2)(A) and (G) and the Court has jurisdiction to address the matter pursuant to 28 U.S.C. §1334. For the reasons set forth herein, and those set forth on the record at the hearing held February 17, 2017, Ms. Pannill's motion is granted as set forth in this order.

## FINDINGS OF FACT

J. Timothy Shelnut ("Debtor") and Ms. Pannill have a long and contentious divorce proceeding history in the Superior Court of Richmond County Georgia ("Superior Court"). During their marriage, the parties owned several well-furnished residences and they were able to maintain what the Superior Court describes as an opulent

lifestyle due to Debtor's very successful annuity business. Ex. 16, p. 1.   Ultimately, the marriage failed and Ms. Pannill filed for divorce in 2007.   Ex. 13.

Debtor filed his first bankruptcy in June 2008.   Ch. 7 Case No. 08-11067 ("the 2008 Bankruptcy").   During the pendency of this bankruptcy, the parties reached their first[1] settlement agreement as to alimony and property division.   Ex. 13.   Debtor received his bankruptcy discharge in February 2009.   Dckt. No. 112, Ch. 7 Case No. 08-11067.   In April 2010, the parties were divorced with the final divorce decree incorporating the settlement terms. Ex. 13.

Debtor failed to fulfill his obligations under the final divorce decree and in July 2014 the Superior Court entered an interim order finding Debtor in contempt of the divorce decree because of:  an alimony arrearage of over $50,0000.00; a $150,000.00 arrearage in the yearly lump sum alimony payments; and Debtor's failure to maintain a life insurance policy with Ms. Pannill as the beneficiary.   Ex. 14.   ("First Contempt").

The Superior Court concluded Debtor had the ability to pay

---

[1]   The Superior Court orders indicate there have been numerous settlements and agreements throughout the divorce proceedings.   For purposes of this analysis, the Court is focusing on the settlements/agreements pertinent to this matter and merely referring to these in numerical order for convenience.

AO 72A
(Rev. 8/82)

the alimony but opted to financially favor himself and others over his court-ordered obligations to Ms. Pannill. Id. Specifically, the Superior Court found Debtor had opted to repay a personal loan of approximately $68,000.00 to a third party[2] and to pay almost $10,000.00 for custom plantation shutters for his home instead of paying his domestic obligations to Ms. Pannill. Ex. 14. The Superior Court also concluded Debtor feigned ignorance of his financial matters while being a shrewd and sharp businessman. Id. The Superior Court deferred ruling on the contempt issue as to Debtor's purported disposition of certain furniture and his failure to pay Ms. Pannill's attorney fees until another hearing could be held to consider these matters.

In regards to the First Contempt proceeding, the Superior Court ordered Debtor incarcerated until he purged himself of the $199,675.00 alimony arrearage. Ex. 14. While incarcerated, Debtor and Ms. Pannill reached another repayment agreement and Debtor was released from jail after more than two months of incarceration. Ex. 15. In August 2014, the Superior Court entered an order incorporating the new detailed repayment plan the parties had reached. Ex. 15. ("Second[3] Settlement Agreement").

---

[2]   A Dr. Smith.

[3]   See n. 1.

3

In October 2016 after the deferred hearing regarding the furniture and attorney's fees, the Superior Court found Debtor in civil and criminal contempt and entered a Final Order on Ms. Pannill's Motion for Contempt wherein it outlined Debtor's "recalcitrance . . . . fraudulent and contemptuous conduct toward Pannill" and his failure to comply with court orders throughout the divorce proceedings, specifically providing:

> This contempt and the preceding divorce epitomize the foulness and spitefulness of domestic disputes. Forgetting the parties' conduct which gave rise to the divorce, neither party has acted with good faith, candor and equity with each other or the court. [Debtor's] egregious conduct resulted in a receiver having been appointed, and he failed to comply with the instructions of the receiver or the court. While he always seemed to "find" money when pressed to do so, he left [Pannill] virtually penniless at times. The court believes that [Debtor] has an undisclosed source of revenue. The court further believes that his [2008 Bankruptcy] was a sham to escape the press of several foreclosure deficiencies. Moreover, the court believes that the gun collection given to the trustee [in connection with the 2008 Bankruptcy] was not the extraordinarily valuable collection described by Pannill which was displayed at [the parties' marital home] and their former residence in Burke County [referred to as the lodge]. The court believes that the expensive collection is still in [Debtor's] possession or under his control. The court believes that [Debtor] has the ability to pay this judgment.
>
> With regard to the [] furniture [awarded to Pannill], the court believes that [Debtor] knew Pannill thought she was going to receive her

4

premarital assets, expensive furniture which [Debtor] had already taken to [his new home], and other furniture and furnishings that had long since left [the marital residence]. It is unfortunate that punitive damages are not recoverable in a contempt proceeding.

Pannill is not without fault. She waited four years, until alimony accumulated to $199,675.00, to bring this action while she claimed to be virtually destitute. Furthermore, she waited four years to bring this action to recover for the wine and the awarded furniture. It appears to the court that Pannill planned to "live off of" the sale of these assets. Yet, after she left [the marital home] in 2007, she never returned. She settled the divorce without ever inspecting [the furniture] she thought she was getting. She never earnestly sought to recover the wine or the missing awarded furniture. This failure to act is inexplicable to the court. Meanwhile, memories have faded, and both parties have suffered difficulty in proving their cases. This judge has spent almost as many hours on this case as Pannill's attorney. Both parties are admonished for their dilatory conduct.

### Contempt of Court

The court has previously found [Debtor] in serious contempt of the [Divorce] Decree which led to his incarceration for a significant period of time. Generally, [Debtor] has failed to meet his substantial agreed to monetary obligations to Pannill causing Pannill severe financial hardship. These issues have been dealt with in previous orders in this action which are incorporated herein.

The court finds [Debtor] in civil and criminal contempt of court for his failure to comply with the [Divorce] Decree with regard to the awarded furniture as set forth herein. [Debtor] disposed of or permitted others to remove or

5

> dispose of substantially all of the awarded
> furniture from the [marital home], all to the
> detriment of Pannill.  A finding of contempt
> regarding specific items is set forth above.

Ex. 16, pp. 2 and 14-16 ("Second Contempt Order").  The Superior

Court further found Debtor violated the Superior Court's Automatic

Domestic Standing Order by opting to purchase a $675,000.00

townhouse on Wilmington Island while he was delinquent in his

domestic support obligations.  Id. at p. 2.

In this Second Contempt Order, the Superior Court awarded

Ms. Pannill the sum of $375,086.59 comprised of the following:

$344,784.00 as the fair market value of the furniture awarded to Ms.

Pannill which she never received; $2,500.00 for repair costs and

storage fees paid for furniture; $15,000.00 in unpaid attorney's

fees; minus $425.00 for a previous overpayment.  Ex. 16.[4]  The

Superior Court also ordered Debtor to:

> immediately cause a life insurance policy on
> his life, payable to Pannill, to be reinstated,
> and proof of reinstatement provided to counsel
> for Pannill within thirty days of the date of
> this order.  Alternatively, if said coverage
> cannot be reinstated, then [Debtor] shall
> collaterally assign so much of his existing
> life insurance coverage to Pannill so that, in
> the event of his untimely death, she would

---

[4]  Ms. Pannill also was awarded the furniture in the possession
of the repair shop described as "a large entertainment center/wall
unit with five sections and a mahogany twin sized bed."  Ex. 16., p.
11.

6

> receive $375,086.59 or the unpaid balance of
> this judgment, plus penalties and interest at
> the judgment rate, if less than $375,086.59.

Ex. 16.

The Second Contempt Order required Debtor to pay the

$375,086.59 by December 8, 2016 or report for incarceration on

December 9, 2016. Ex. 16. Debtor sought a new trial which was

denied. Ex. 18. He then filed for a discretionary appeal with the

Georgia Supreme Court which was denied. Ex. 17. An arrest order

was issued on January 11, 2017 stating "the [Debtor] having failed

to comply with the order of this court, to either pay the Judgment

by the Due Date or report for the Incarceration, Now therefore, the

sheriff is hereby ordered to arrest the [Debtor], and incarcerate

him in the Richmond County Jail until he pays the sum of

$375,086.59." Ex. 18.

Debtor failed to timely tender these funds to Ms. Pannill

or report to jail. He filed this chapter 11 bankruptcy petition on

January 24, 2017. Ms. Pannill filed an "Emergency Motion to

Abstain, or in the Alternative, for Modification of the Automatic

Stay, or a Determination that the Automatic Stay is Not Applicable

Under 11 U.S.C. §362(b)(1) and (2)."

As of the February 17, 2017 hearing on the emergency

motion, Debtor had not paid Ms. Pannill any of the $375,086.59

award, nor provided proof of the required insurance or assignment to

7

Ms. Pannill's lawyer. However, at the hearing, Debtor stated he had made the required changes to the insurance policy.

At the hearing, Debtor agreed the Second Contempt Order is res judicata in this bankruptcy proceeding and establishes the amount of Ms. Pannill's claim at $375,086.59. Under these facts and circumstances, Debtor contends he may propose a chapter 11 plan addressing Ms. Pannill's claim and all his other claims. Debtor acknowledged the Second Contempt Order and arrest warrant were the impetus for filing this bankruptcy. He contends he simply does not have the money or means to pay the award in accordance with the terms of the Second Contempt Order. He stated his other creditors will work with him, but Ms. Pannill is no longer willing to work with him.

Debtor is 69 years old. He is no longer employed, but receives his income from: dividends from his annuity business; social security; and a mortgage on Walden Drive Property. Ex. 4. At the emergency hearing, Debtor was unable to clearly explain much of his financial condition including how a loan described as "Four Seasons Shareholder Loan" and payable to the Debtor was worth $4,484,673.31 in 2017, but only worth $578,723.00 in 2008. Compare Ex. 1, Schedule B with Exs. 3, Schedule A/B and 8, Statement of loan.

Debtor's bankruptcy schedules reflect his gross monthly

8

income is $21,709.00, with monthly expenses of $10,650.00, resulting in a net monthly income of $11,059.00. Exs. 4 and 5. Schedules A/B and D value Debtor's real estate holdings at $398,000.00 consisting of: his condominium residence in Pooler, Georgia worth $350,000.00 and encumbered by the $300,000.00 reverse mortgage; and unencumbered cemetery plots worth $48,000.00. Ex. 3. Debtor's Schedule A/B value his personal property at $4,792,073.57. Ex. 3. Specifically, Schedule A/B includes two Mercedes one unencumbered 2009 Mercedes worth $12,000.00 and a 2013 Mercedes worth $45,000.00, encumbered by a $44,640.00 claim of Mercedes Benz Financial Services. Id. According to Debtor's bankruptcy schedules, he intends to surrender the 2013 Mercedes to the creditor. Debtor's schedules also list Debtor's total liabilities at $1,171,132.15 including Ms. Pannill's claim at $375,086.59 along with several personal loans owed to third parties, past due country club membership dues for Savannah Quarters Country Club and Westbrook Golf, and professional fees. Ex. 3. Furthermore, Debtor's schedules list a debt to the Internal Revenue Service of $250,000.00 and a debt to the Georgia Department of Revenue of an "unknown" amount. Id. Debtor's initial schedules value his assets at $5,190,073.57; and he subsequently amended this asset valuation to $5,201,933.57.[5]

---

[5]   See n. 6 infra.

AO 72A
(Rev. 8/82)

In an effort to obtain correct values for his bankruptcy schedules and to show exactly what furniture is in his current home, Debtor obtained an appraisal of the furnishings in his current home valuing the household furniture at $21,850.00 in a quick sale and $45,085.00 after a 6 month effort.[6]   Ex. 48.   Debtor acknowledged several of the pieces of furniture included in this appraisal came from the marital home place, but argued these pieces were ones that he was allowed to keep or that Ms. Pannill refused to pick up.   Ms. Pannill disagreed with this testimony and said some of the pieces were never disclosed to the Superior Court and she had wondered where the pieces had gone.

As to the gun collection addressed in the Second Contempt Order, Debtor and Ms. Pannill had dramatically different recollections as to the value of the guns.   Ms. Pannill testified that many of guns in the display were worth thousands of dollars each.   Without objection, Ms Pannill testified that a friend familiar with guns was able to identify many of the guns from photos and pointed her to appropriate websites to obtain the value of some of the guns.   These guns were part of Debtor's bankruptcy estate in his 2008 Bankruptcy.   However, Ms. Pannill contended the guns Debtor

---

[6]   After the hearing, Debtor amended his Schedule A/B to include the new appraised values.   This slightly increased the Schedule A/B asset value from $5,190,073.57 to $5,201,933.57.   Dckt. No. 41.

10

turned over for liquidation in his 2008 Bankruptcy were a different collection and an inferior collection of less valuable guns. During the marriage, Debtor and Ms. Pannill had guns both in their marital home and the lodge. Debtor testified the guns he turned over in Debtor's 2008 Bankruptcy were ones from his house. He said at the time he filed the 2008 Bankruptcy he no longer had the lodge gun collection. He testified he does not know where the lodge guns are, but he thinks the bank must have taken them and everything else when it foreclosed on the lodge. Despite this testimony, Debtor later testified to having some of the lodge furniture in his current house. The Superior Court did not find Debtor's testimony regarding the guns to be credible and concluded Debtor remains in possession or control of the very valuable gun collection. Ex. 16. After considering the testimony and demeanor of the parties at the emergency hearing, this Court also does not find Debtor's testimony regarding the guns to be credible.

### CONCLUSIONS OF LAW

Ms. Pannill's emergency motion asks the Court to abstain from this matter to allow her to pursue her claim in the Superior Court pursuant to <u>Carver v. Carver</u>, 954 F.2d 1573 (11th Cir. 1992). Ms. Pannill also seeks a determination that the 11 U.S.C. §362(a) automatic stay is inapplicable to her claim pursuant to 11 U.S.C. §362(b)(1). Alternatively, if the Court finds the §362 stay

11

applicable, Ms. Pannill requests relief from the stay for cause pursuant to 11 U.S.C. §362(d)(1).  As set forth below, this Court abstains and grants Ms. Pannill relief from the automatic stay pursuant to 11 U.S.C. §362(d)(1).

**Abstention**.

        It is undisputed that Debtor has not complied with the terms of the Second Contempt Order or previous orders of the Superior Court.  The issue is which court is the proper court to resolve these issues, the Superior Court or the Bankruptcy Court where the Debtor proposes to file a chapter 11 plan to pay this claim along with Debtor's other claims.  Pursuant to 28 U.S.C. §1334(c)(1), this Court may abstain "in the interest of justice, or in the interest of comity with State courts or respect for State law."  28 U.S.C. §1334(c)(1).  In Carver, the Eleventh Circuit cited the strong state interest in domestic relations matters and noted given the facts of that case, the bankruptcy court should have abstained from resolving allegations of a stay violation where the purported violation involved the enforcement of support obligations. Carver v. Carver, 954 F.2d 1573, 1578-79 (11th Cir. 1992).  Among other things, the Carver court was concerned about bankruptcy being used as a weapon in an on-going dispute between former spouses. Carver, 954 F.2d at 1580.  When considering such matters, the Eleventh Circuit instructed bankruptcy courts to carefully sift

12

AO 72A
(Rev. 8/82)

through the facts keeping in mind the purposes of the automatic stay as well as concerns of justice, comity, and judicial economy that support abstention in domestic relations cases. <u>Carver</u>, 954 F.2d at 1579. "Where the purposes of the automatic stay provision would clearly be served by affording a remedy for its violation, and the court would not be required to delve too deeply into family law, the court need not abstain from hearing the claim." <u>Id</u>. at 1580.

Bankruptcy courts have noted that "[t]wo general rules appear to have emerged from the <u>Carver</u> decision: 1) Relief from stay should be liberally granted in actions involving family law matters; and 2) Federal courts should abstain from hearing such matters unless the court can avoid delving too deeply into family law." <u>In re Fullwood</u>, 171 B.R. 424, 426 (Bankr. S.D. Ga. 1994).

In this domestic case, the Superior Court found Debtor has repeatedly failed to comply with the orders of the Superior Court. As a result of his "egregious conduct" the Superior Court appointed a receiver. The Superior Court found Debtor failed to comply with the instructions of the receiver or the Superior Court. The Superior Court believed Debtor's 2008 Bankruptcy was a "sham" designed to escape the press of impending foreclosure actions and it frustrated the enforcement of Ms. Pannill's domestic claim. Ex. 13, p. 1; Ex. 16, pp. 4 and 15. The court also thought Debtor still retained possession or control of a valuable gun collection that was

13

not properly turned over to the trustee for liquidation during Debtor's 2008 Bankruptcy. Ultimately, the Superior Court concluded Debtor had the ability to fulfill and pay his domestic obligations to Ms. Pannill, but wrongfully refused to comply with the terms of the previous agreements and orders, often favoring himself and others over Ms. Pannill. At times, these actions left Ms. Pannill virtually penniless and caused her severe financial hardship.

As of the hearing date, Debtor has failed to make any payments to Ms. Pannill since the order was entered in October 2016 and he has failed to timely deliver to Debtor's counsel evidence of the necessary adjustments to his insurance policy. At the hearing, Debtor claimed he made the necessary changes to the insurance policy, but he failed to timely tender evidence of this to Debtor's counsel.

As stated in Carver, the Superior Court has a strong state interest in domestic relation matters and given the facts and circumstances of this case, it is appropriate for this Bankruptcy Court to abstain from considering this matter in the interest of justice and comity with the state courts and out of respect for state law. See Cummings v. Cummings, 244 F.3d 1263, 1267 (11th Cir. 2001)("[W]e previously have noted that '[i]t is appropriate for bankruptcy courts to avoid incursions into family law matters out of consideration of court economy, judicial restraint, and deference to

14

our state court brethren and their established expertise in such matters.'").

Furthermore, the Superior Court's findings as to the nature of Debtor's conduct favor abstention. Similar to this case, the debtor in In re Cottingham, 2005 WL 6777063, at *1 (Bankr. S.D. Ga. May 25, 2005) had been held in contempt several times before filing for bankruptcy relief. In re Cottingham, 2005 WL 6777063 at *1. The bankruptcy court found the debtor was using the bankruptcy as weapon to get out of jail and found the state court had a strong interest in enforcing its order given debtor's egregious conduct in the domestic proceeding. Id. at *2-3. In another similar case, the court in In re Trout, 414 B.R. 916, 920-21 (Bankr. S.D. Ga. 2009) granted relief from the stay allowing the movant to collect alimony, maintenance, and support obligations and finding the bankruptcy was being used as a weapon and noting the state court had previously cited the debtor for contempt several times. In re Trout, 414 B.R. at 920-21; see also In re McClendon, 2012 WL 4758363, at *2 (Bankr. S.D. Ga. Sept. 14, 2012)(citing Carver when granting relief from stay where the debtor had been incarcerated for contempt, still owed a substantial amount of domestic support obligations, the amount necessary to purge the contempt had been set by the state court, and the chapter 13 plan proposed payments contrary to the superior court order).

15

The Eleventh Circuit in In re Caffey, 384 F. App'x 882, 885 (11th Cir. June 23, 2010) upheld the bankruptcy court's decision not to abstain where there was no evidence the bankruptcy was being used a weapon and where the bankruptcy estate would be harmed if the debtor was incarcerated because he needed to work to pay off his creditors, and where the debtor was not hiding his bankruptcy filing in order to maintain his violation of the stay complaint for damages. Caffey, 384 F. App'x at 885-86. Similarly, the bankruptcy court in Fullwood distinguished Carver denying a motion to lift the stay to enforce a pre-petition domestic support judgment against the debtor because it found the bankruptcy court would not be required to "delve too deeply into family law." In re Fullwood, 171 B.R. at 428. Debtor contends the Second Contempt Order establishes Ms. Pannill's claim amount and it is merely a claim to be addressed by Debtor's chapter 11 plan and would not require this Court to delve too deeply into family law. However, as the testimony at the emergency hearing demonstrated, addressing this claim will require this Court to delve deeply into family law. Any payment provision and treatment of Ms. Pannill's claim will delve into family law matters including Debtor's good faith and the ability to pay. Furthermore, altering the payment terms in the chapter 11 plan would be contrary to the terms of the Second Contempt Order and contrary to the Superior Court's findings regarding Debtor's ability to pay.

16

In re McClendon, 2012 WL 4758363 at *2 (a factor in favor of granting relief was that the chapter 13 plan proposed payments contrary to the superior court order). Fullwood is further distinguishable because unlike the current case, there was no evidence of egregious behavior by the debtor in the state court proceedings and no conclusion that addressing the claim would require the court to delve deeply into the domestic matters. Also, unlike the current case, there was no evidence the bankruptcy system was being used as a weapon against the former spouse.

In this case, the Court concludes as in Carver, Debtor is using this bankruptcy as a weapon against Ms. Pannill. Debtor acknowledged the obligation to Ms. Pannill is what drove him into bankruptcy. Despite Debtor's protest to the contrary, the Superior Court found Debtor had the ability to pay Ms. Pannill but chose not to pay her, while purchasing new homes, gifting/loaning furniture and vehicles to his family members, and paying a third party more than sixty thousand dollars on a personal loan. Exs. 14 and 16. Debtor's conduct imposed a severe financial hardship on Ms. Pannill and left her virtually penniless at times. The Superior Court believed Debtor's 2008 Bankruptcy was a "sham" and concluded Debtor "raided" the marital home and lodge to furnish his new home, maintain his lifestyle, and provide furnishings that he knew belonged to Ms. Pannill to his sons. Ex. 16, pp. 3, 9. It was

17

clear to the Superior Court that Ms. Pannill planned to support herself through the sale of these furnishings.

In addition, after considering the testimony and observing Debtor's demeanor, the Court agrees with the Superior Court's conclusion regarding Debtor's testimony about his financial situation. Debtor ran a sophisticated annuity business which he testified he sold for $7.0 million dollars. Debtor also filed his bankruptcy schedules under penalty of perjury. These schedules set forth his assets and liabilities. The Court does not find Debtor's lack of clarity as to his financial condition to be credible. Nor does the Court find Debtor credible on the status, location, and value of the gun collection, especially after he acknowledged he retrieved some personal property from the lodge, after previously testifying that the bank must have taken the guns and personalty when it foreclosed. Unlike <u>Fullwood</u>, Debtor's actions throughout this process have been found to be egregious and he is using the bankruptcy process as a weapon in his arsenal to thwart Ms. Pannill's claim.

In this case, as in <u>Carver</u>, the interest of justice, comity, and respect for state courts and state law outweigh the potential harm to the bankruptcy estate. Debtor has few secured creditors and he testified that most of his creditors were willing to work with him on repayment. Debtor is an annuitant, not

18

employed, so his income will not cease. At the hearing, Debtor acknowledged Ms. Pannill holds a domestic support obligation as defined in 11 U.S.C. §101(14)(A). As such, under the Bankruptcy Code, the claim is a first priority claim and nondischargeable. See 11 U.S.C. §§101(14)(A), 507(a)(1), 523(a)(5) and (a)(15), and 1141(d)(2). Given the facts and circumstances of this case, Debtor's concern that abstention may allow Ms. Pannill to obtain a judgment lien on all of Debtor's assets does not outweigh the factors considered for abstention. See Carver, 954 F.2d at 1579; Caffey, 384 F. App'x at 885-86.

In addition to the precedent set forth in Carver, the following factors also favor abstention in this case: the effect of abstention on the efficient administration of the bankruptcy estate; the extent to which state law issues predominate over bankruptcy issues; the presence of a related proceeding commenced in state court or other non-bankruptcy court; the likelihood that the commencement of the proceeding in bankruptcy court involves forum shopping by one of the parties; comity; and lastly, the possibility of prejudice to Ms. Pannill if the Court does not abstain. See In re Old Augusta Dev. Group, Inc., 2011 WL 2632147, at * 4 (Bankr. S.D. Ga. May 16, 2011)(listing fourteen non-exclusive abstention factors to consider in determining whether abstention is appropriate). As previously stated, abstention will have little

19

effect on the bankruptcy estate as Debtor's income does not depend on his employment and he may still propose a plan. State law issues predominate in these circumstances and the Superior Court has a strong state interest in this matter where this divorce proceeding has been pending for almost ten years. Abstention certainly is not required in all divorce/domestic matters, but given the facts and circumstances of this case, and after weighing all of the abstention factors and observing the parties' demeanor, the Court concludes abstention is appropriate. In these circumstances, the interests of justice and comity weigh in favor of abstention due to the expertise the Superior Court has in domestic relations matters and the ongoing interest it has in upholding the dignity of its own orders, as well as the conduct of the parties.

**Relief from the Stay**.

The second issue involves whether these actions are excepted from the §362 stay; or, in the alternative, whether relief from the stay should be granted. Once a bankruptcy petition is filed a stay of all collection activities automatically arises protecting property of the bankruptcy estate and the debtor. See 11 U.S.C. §362(a). In this case, Ms. Pannill argues the stay does not apply to the enforcement of the arrest warrant because the Superior Court found Debtor in criminal contempt and therefore this matter is excepted from the stay by 11 U.S.C. §362(b)(1) which provides:

20

AO 72A
(Rev. 8/82)

> (b) The filing of a petition under section 301, 302, or 303 of this title, or of an application under section 5(a)(3) of the Securities Investor Protection Act of 1970, does not operate as a stay—
>
>> (1) under subsection (a) of this section, of the commencement or continuation of a criminal action or proceeding against the debtor. . . .

11 U.S.C. §362(b)(1).   The Court disagrees with Ms. Pannill's argument as to §362(b)(1).

The Eleventh Circuit has stated notwithstanding labels, the inquiry of whether an arrest warrant for contempt is criminal in nature is whether its primary purpose is to uphold the dignity of court or whether is it really being used as a collection device initiated by a private party.   In re Caffey, 384 F. App'x at 886 (holding that the test to determine if a contempt order is civil or criminal in nature is whether there is a purge amount); In re Goodman, 277 B.R. 839, 841 (Bankr. M.D. Ga. 2001) (first step is to determine if the arrest warrant is criminal or civil in nature).

In this case, the arrest warrant states in pertinent part, "the [Debtor] having failed to comply with the order of this court, to either pay the judgment by the due date or report for the incarceration, now therefore, the sheriff is hereby ordered to arrest the [Debtor], and incarcerate him in the Richmond County Jail until he pays the sum of $375,086.59."   Ex. 18.   Based upon a review

21

of the Second Contempt Order and arrest warrant, the Superior Court order was both upholding the dignity of its order and collecting a debt.   However, this Court concludes the key component and primary purpose of the Second Contempt Order was to collect a debt.   This is evident based upon the language of the Second Contempt Order that gives Debtor the "keys to his own jail cell" by paying a sum certain by the due date.   See Hicks on Behalf of Feiock v. Feiock, 485 U.S. 624, 633 (1988)("A conditional penalty, by contrast, is civil because it is specifically designed to compel the doing of some act. 'One who is fined, unless by a day certain he [does the act ordered], has it in his power to avoid any penalty.   And those who are imprisoned until they obey the order, carry the keys of their prison in their own pockets.'").   The Second Contempt Order allowed Debtor to purge himself of criminal and civil contempt by paying the money by a date certain and thus this Court concludes the Second Contempt Order is more civil in nature.   As a result, this Court finds the criminal proceeding exception of 11 U.S.C. §362(b)(1) does not apply and therefore the §362 automatic stay applies to Ms. Pannill's enforcement action.   In re Caffey, 384 F. App'x at 886.

In the event the Court concluded the §362(b)(1) exception did not apply, Ms. Pannill sought alternate relief from the stay pursuant to 11 U.S.C. §362(d)(1) which provides:

On request of a party in interest and after

22

> notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay-
>
>> (1) for cause, including the lack of adequate protection of an interest in property of such party in interest . . . .

11 U.S.C. §362(d)(1).  Ms. Pannill argues "cause" to lift the stay exists based upon the Debtor's behavior in the divorce proceedings. Conversely, Debtor argues he is financially unable to comply with the terms of the Second Contempt Order without the bankruptcy stay and therefore cause does not exist.

Abstaining alone does not eliminate the §362 stay.  See 28 U.S.C. §1334(d); Pursifull v. Eakin, 814 F.2d 1501, 1505 (10th Cir. 1987)("Even where the court has abstained pursuant to §1334(c), the stay granted under §362 must be modified in order to allow the resolution of claims other than in the court with jurisdiction over the bankruptcy.").  As Carver instructs, "[w]hen requested, such relief should be liberally granted in situations involving alimony, maintenance, or support in order to avoid entangling the federal court in family law matters best left to state court."  Carver, 954 F.2d at 1578; Cummings, 244 F.3d at 1267 (advising the ex-wife may want to seek relief from the stay because such relief should be liberally granted in domestic matters); In re Williford, 294 F.

23

App'x 518 (11th Cir. Sept. 24, 2008)(upholding bankruptcy court's retroactive annulment of the stay and stating "[T]he fact that the divorce decree itself was inequitable in [the debtor's] view does not alter our conclusion, as it was not unreasonable for the bankruptcy court to decline to interfere with the circuit court's division of marital property and as two appellate courts, including the state Supreme Court, already had affirmed this division."). Relief from the stay should be granted where the debtor "has vigorously litigated his divorce and the financial obligations arising therefrom for over two years . . . . [a]vailed himself of every possible opportunity to seek review and reversal of obligations imposed both by the temporary order and the final decree. He has been hauled into court on more than one occasion and cited for contempt. He was found to be in willful contempt. He has been provided with a carefully crafted and reasonable repayment schedule by the Superior Court . . . in order to allow him to purge himself of that contempt. He attempted to have that Order overturned, and during the pendency of that effort, he acted in ways that clearly violated the spirit, if not the obligations imposed by that order." In re Trout, 414 B.R. at 920.

As in Carver, Williford, and Trout, Debtor is using this bankruptcy as a weapon in an ongoing domestic battle with his former spouse. The Superior Court order reduced Ms. Pannill's claim to a

24

monetary amount, requiring Debtor to pay the sum and adjust his life insurance policy. Debtor has failed to comply with these terms. He has been found in civil and criminal contempt on more than one occasion. Not just for his failure to pay, but rather he has been found to have the ability to pay but continues to refuse to pay while favoring himself and others over Ms. Pannill, causing her severe financial hardship and leaving her, at times, virtually penniless. He has sought to overturn the Superior Court's order to no avail and when that did not work he filed for bankruptcy. As set forth in the Superior Court's orders, his overall behavior regarding his fulfillment of his divorce obligations has been egregious. Lifting the stay also allows the Superior Court to uphold the dignity of its own orders. For these reasons, and the reasons set forth at the February 17, 2017 hearing, the Court finds cause exists to lift the automatic stay pursuant to 11 U.S.C. §362(d)(1).

For the foregoing reasons, and the reasons set forth on the record at the hearing held February 17, 2017, the Court ABSTAINS from this matter and relief from the §362 automatic stay is ORDERED GRANTED to Ms. Pannill as to these matters pursuant to 11 U.S.C. §362(d)(1).

SUSAN D. BARRETT
CHIEF UNITED STATES BANKRUPTCY JUDGE

Dated at Augusta, Georgia
this 21st Day of March 2017.